UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :
                                                :
UNITED STATES OF AMERICA                        :
                                                :
     - v. -                                     :        11 Cr. 927 (DAB)
                                                :
JOHN BENNETT,                                   :
                                                :
                    Defendant.                  :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**


                                        PREET BHARARA
                                        United States Attorney for the Southern
                                        District of New York

MICHAEL A. LEVY
RICHARD C. TARLOWE
MARISSA MOLÉ BOSTICK
Assistant United States Attorneys

          - Of Counsel -

The Government respectfully submits this memorandum in connection with the sentencing of John Bennett.  While the Government has no reason to dispute Bennett's description of his upbringing and his charitable endeavors, Bennett's description of the offense conduct in this case presents a meaningfully incomplete picture of his crimes.  While Bennett's misdeeds may have been without precedent in his life, once he chose to engage in criminal conduct, he did so regularly and repeatedly over a period of four years.  For this reason, the Government respectfully submits that a significant sentence of imprisonment is warranted in this case.

## I.   BENNETT'S CRIMINAL CONDUCT

Bennett's criminal conduct was not, as he would have the Court believe, "simple."  (Def. Sent. Mem. at 24).  Bennett presents his conduct as though it consisted merely of trading on two illegal stock tips.  (Def. Sent. Mem. at 24-25).  In fact, as described below, Bennett's criminal conduct consisted of: (i) making illegal trades based on material, nonpublic information; (ii) passing the information on to a co-conspirator for the purpose of having that co-conspirator make illegal trades based on the same information; (iii) executing various elaborate schemes to conceal the illegal trading; and (iv) obstructing justice by obtaining a cooperation agreement from the Government under false pretenses – specifically, by admitting his own guilt and the guilt of one co-conspirator while repeatedly lying to the Government to conceal the guilt of another co-conspirator.

### A.   Bennett's Own Illegal Trading

Bennett's insider trading arose from his close friendship with Scott Allen, who was a principal at a human resources consulting firm in Atlanta, Georgia (the "Consulting Firm").  Through his work at the Consulting Firm, Allen was privy to material, nonpublic information about unannounced takeovers of publicly-traded companies.  In February 2008 and April 2009,

Allen tipped Bennett about two such takeovers so that Bennett could trade illegally on the information and reap enormous illegal profits.

1.      Millennium Pharmaceuticals

In or about February 2008, the Consulting Firm was hired in connection with an acquisition of Millennium Pharmaceuticals, Inc. ("Millennium"), a publicly-traded bio-pharmaceutical company. After learning of the acquisition as part of his work for the Consulting Firm, Allen disclosed material, nonpublic information concerning the takeover to Bennett so that Bennett could execute securities transactions on the basis of that information. Over the course of approximately a month, Bennett purchased a number of Millennium call option contracts at a total cost of approximately $17,000. On or about April 10, 2008, the acquisition of Millennium was publicly announced, causing the stock price to jump. Following that announcement, Bennett sold the Millennium options for a profit of approximately $602,000. Shortly thereafter, as described more fully below, Bennett began making cash payments to Allen.

2.      Sepracor, Inc.

In or about April 2009, the Consulting Firm was hired in connection with an acquisition of Sepracor, Inc. ("Sepracor"), a publicly-traded specialty pharmaceutical company. After learning of the acquisition as part of his work for the Consulting Firm, Allen disclosed material, nonpublic information concerning the takeover to Bennett so that Bennett could execute securities transactions on the basis of that information. Bennett executed various transactions in Sepracor options over the course of approximately a month. On or about September 3, 2009, the acquisition of Sepracor was publicly announced and the stock price jumped. By trading Sepracor securities ahead of that announcement, Bennett generated illegal profits of approximately

$516,000.

**B.      Bennett's Transmission of the Inside Information to a Co-Conspirator**

Bennett did not stop at using the material, non-public information about Millennium and

Sepracor (the "Inside Information") to trade on his own behalf.  Rather, almost as soon as Bennett

obtained the Insider Information from Allen, Bennett passed the Inside Information along to his

business partner (the "Business Partner") so that the Business Partner could join Bennett in

making illegal trades and reaping illegal profits.  In coordination with Bennett, the Business

Partner knowingly used the Inside Information to trade in securities of both Millennium and

Sepracor.  In 2008, based on an investment of only $45,000, the Business Partner used the Inside

Information provided by Bennett about Millennium to make a profit of approximately $1.1

million.  A year later, the Business Partner used the Inside Information provided by Bennett about

Sepracor to make a profit of approximately $560,000.[1]

**C.      Bennett's Pre-Investigation Acts of Concealment**

In addition to trading on the Inside Information – and providing the Inside Information to

the Business Partner so that he could do the same – Bennett also undertook a variety steps to

conceal his illegal conduct.  For example, contemporaneous with the Millennium trading and the

Sepracor trading, Bennett made a point of engaging in staged email conversations with the

---

[1]  In a footnote to his sentencing submission, Bennett notes that his offense level would
be two levels lower if one focused solely on the profits made by Bennett, himself.  (Def. Sent.
Mem. at 24 n.1).  But, as Bennett appears to concede, the Guidelines require consideration of all
gain resulting from Bennett's criminal conduct, including the gain resulting from the Business
Partner's illegal trading.  Moreover, as the foregoing shows, it is perfectly fair to do so in this
case.  Bennett provided the Inside Information to the Business Partner with the specific intent
that the Business Partner would use the Inside Information to engage in illegal trading.  The
Business Partner's illegal trading profits were not simply foreseeable to Bennett – they were
knowingly caused and expected by Bennett.

Business Partner about the merits of Millennium and Sepracor for the purpose of creating a phony record that would conceal the fact that the men were trading based on Inside Information and, instead, make it appear to any subsequent investigator that they were discussing legitimate reasons for their investments.

These efforts at concealment, however, paled in comparison to the efforts that Allen and Bennett made over a course of several years to eliminate all evidence of their ongoing friendship, even as Allen and Bennett continued to meet on a regular basis so that Bennett could reward Allen with cash payments. When Allen began tipping Bennett in 2008, the two had already been friends for a number of years and had been communicating regularly using ordinary home, office, and cellular phones that were held in their own names or were otherwise easily traceable to them. After the scheme began, however, in order to create the false impression that they no longer were in contact, Allen and Bennett ceased communicating with each other on phones that were traceable to them. Instead, they used pay phones and other public phones – for example, when Allen flew from Atlanta to New York, he often used a phone at the Delta Sky Lounge at LaGuardia Airport to contact Bennett – in order to arrange in-person meetings.

At these secretly arranged meetings, Bennett shared with Allen the proceeds of their illegal insider trading scheme. The two met in person in New York on more than 20 separate occasions – from April 2008 through the summer of 2010 – for Bennett to make cash payments to Allen. Bennett typically provided Allen with approximately $5,000 in cash at each meeting; money that Bennett frequently withdrew from the bank shortly before their meetings. In total, Bennett provided Allen more than $100,000 in cash in exchange for Allen's illegal tips.

### D.      Bennett's Post-Investigation Acts of Obstruction

Notwithstanding Allen and Bennett's efforts at concealment, federal investigators eventually assembled compelling evidence that Bennett had traded in the securities of Millennium and Sepracor based on Inside Information provided by Allen.  In June 2011, prior to any charges being brought, Bennett met with prosecutors at the United States Attorney's Office pursuant to a proffer agreement.  During that meeting, Bennett truthfully admitted that he and Allen had conspired to have Bennett trade based on Inside Information supplied by Allen.  But Bennett lied and concealed the Business Partner's role in the conspiracy.  Specifically, Bennett claimed that the Business Partner's trades had been legitimate because Bennett had never shared with the Business Partner the material, nonpublic information obtained from Allen that Millennium and Sepracor were about to be acquired.

After considering Bennett's proffer – and, in particular, the dubious credibility of his assertion that he had not shared Inside Information with the Business Partner – the Government decided not to offer Bennett a cooperation agreement.  Instead, the Government simply charged Allen and Bennett for their offenses.  Relatively soon after being charged, Bennett entered a plea of guilty.

In March 2012, with Allen's trial approaching later in the month, Bennett accepted an invitation from the Government to come in and proffer again, with the idea that a cooperation agreement might be reached such that Bennett would testify at Allen's trial.  As he had during his earlier meeting with the Government, Bennett truthfully admitted that he and Allen had conspired to commit insider trading, but steadfastly – and falsely – denied having brought the Business Partner into the conspiracy.  Bennett claimed that the Business Partner had traded in Millennium

and Sepracor at Bennett's instigation, but that Bennett had never revealed to the Business Partner the true reason why Bennett was trading in those stocks – namely, because Allen had provided Bennett with the secret news that both companies were about to be acquired.

After pressing Bennett during still one more proffer session about his interactions with the Business Partner – during which Bennett stuck to the same false story – the Government decided to credit Bennett's account and offer him a cooperation agreement. The cooperation agreement was executed on March 15, 2012. The fact of Bennett's cooperation agreement was disclosed that same day to Allen, whose trial was less than two weeks away. Within a day of learning about Bennett's cooperation, Allen agreed to plead guilty.

In the beginning of April, having just pled guilty, Allen met with the Government to proffer information about the Business Partner. In particular, he called to the Government's attention an email message between Bennett and the Business Partner that – contrary to Bennett's consistent protestations of the Business Partner's innocence – appeared to implicate the Business Partner in the conspiracy.

On April 9, 2012, the Government met with Bennett and confronted him with the newly discovered email that appeared to implicate the Business Partner. Faced with this documentary evidence, Bennett finally confessed that he had been consistently lying to the Government in order to protect the Business Partner from prosecution. Bennett admitted that he and the Business Partner had openly discussed the Inside Information prior to the Business Partner's trades in Millennium and Sepracor. Bennett further admitted that he and the Business Partner had contemporaneously engaged in phony, staged email exchanges in order to make it appear that their trades were based on legitimate investment theses rather than inside information.

Finally, Bennett admitted that the scheme to lie to the Government about the Business Partner's culpability was one that Bennett and the Business Partner had devised jointly prior to Bennett's first proffer with the Government in June 2011.  Specifically, Bennett revealed that, in anticipation of that 2011 proffer, he and the Business Partner had met and agreed that Bennett should tell the Government only about Bennett's and Allen's guilt while concealing the Business Partner's guilt.  Bennett and the Business Partner agreed that, in exchange for Bennett lying to protect the Business Partner, the Business Partner  would take care of Bennett's family financially if Bennett was sentenced to a term of imprisonment.  Shortly after the June 2011 proffer, Bennett reported to the Business Partner that he had done as they agreed – namely, admitted his own and Allen's guilt, while concealing the Business Partner's guilt.  Bennett said that he had not specifically renewed this agreement with the Business Partner when Bennett was again invited to proffer in March 2012 (the proffers that led to Bennett signing a cooperating agreement), but that the Business Partner had inquired of Bennett after Allen's March 2012 guilty plea was reported and Bennett had informed the Business Partner that Bennett had participated in meetings with the Government but had continued to protect the Business Partner.

Only when faced with documentary evidence on April 9, 2012 did Bennett reveal that he had lied to the Government throughout his proffers about the Business Partner's involvement in the conspiracy.  Bennett would presumably have told those same lies under oath when called to testify at Allen's trial, had Allen not pled guilty.  Based on this discovery, the Government voided Bennett's cooperation agreement.

## II.    A SIGNIFICANT SENTENCE OF IMPRISONMENT IS WARRANTED

Bennett agrees in his sentencing submission that – absent an enhancement for obstruction

of justice – the United States Probation Office has correctly identified the offense level to be 23. (Def. Sent. Mem. at 30).  In addition, the Government has informed defense counsel of the Government's position that a two-level enhancement for obstruction of justice is required pursuant to U.S.S.G. § 3C1.1.  During a telephone conversation last week, defense counsel informed the Government that Bennett does not object to that two-level obstruction enhancement. The parties further agree that, under the unusual circumstances of this case, Bennett is still entitled to the three-level reduction for acceptance of responsibility, even though he obstructed justice. Thus, the parties agree that the correct total offense level is 25 and that the applicable Guidelines range is 57-71 months' imprisonment.

Despite the substantial Guidelines range applicable to his case, Bennett argues that the Court should impose a sentence that does not include a term of imprisonment.  The Government respectfully submits that Bennett's arguments for such a deviation are without merit and that a significant sentence of imprisonment is warranted in this case.

As noted at the beginning of this submission, the Government has no reason to dispute Bennett's description of his charitable works, and those works are, of course, a factor that the Court should consider in fashioning an appropriate sentence.  But Bennett otherwise substantially misdescribes his own conduct and misapprehends the need for a significant prison sentence in this case.

With respect to his conduct, Bennett asserts that he "does not have a criminal mindset" (Def. Sent. Mem. at 5), and that his criminal conduct in this case was the result of "aberrational judgment" (Def. Sent. Mem. at 28).  The foregoing description of his conduct, however, shows otherwise.  Bennett's illegal activity was not a single, isolated instance of bad judgment that

played out over the course of several days or a week.[2]  Rather, the sequence of criminal events at issue here, which spanned years, was that Bennett: (i) received an illegal tip from Allen about Millennium in March 2008; (ii) shared the tip with the Business Partner and reached an agreement to trade on the information; (iii) staged phony emails to conceal the true reason for his trading; (iv) engaged in numerous trades in Millennium securities over the course of a month's time, before selling all of those securities for a massive profit of approximately $600,000 upon the announcement that Millennium would be acquired; (v) attempted to conceal the offense by deliberately severing all observable ties with Allen, while continuing to meet regularly with Allen in secret over the course of more than a year to deliver more than $100,000 in cash kickbacks; (vi) received another illegal tip from Allen in 2009, this time about Sepracor; (vii) again shared the tip with the Business Partner and reached an agreement to trade on the information; (viii) again staged phony emails to conceal the true reason for trading; (ix) again engaged in numerous trades in Sepracor securities over the course of a month's time, before selling all of those securities for another massive profit of more than $500,000 upon the announcement that Sepracor would be acquired; (x) upon being caught and invited to make a proffer to the Government in 2011 about his illegal conduct, entered into an agreement with the Business Partner to lie to the Government to conceal the Business Partner's participation in the conspiracy; (xi) followed through on that obstructive agreement and knowingly lied to the Government in the

---

[2]  An example of such isolated conduct would be that of Clayton Peterson in *United States* v. *Peterson*, 11 Cr. 665 (RPP), to whom Bennett compares himself in seeking a non-incarceratory sentence.  (Def. Mem. at 31-32).  In that case, Peterson tipped his son about the impending acquisition of a company on whose board Peterson sat, and the son (also subsequently convicted) traded on the information and, unbeknownst to Peterson, shared the tip with several others who traded.  The criminal conduct was unplanned and took place over the span of approximately one week.

2011 proffer; (xii) continued to proffer the same lie to the Government during 2012 proffer

sessions; and (xiii) entered into a cooperation agreement with the Government in 2012, knowing

that he had lied about the Business Partner's involvement and intending to do so under oath at

Allen's upcoming trial.

Bennett may regret having slipped into a life of crime, but that is precisely what he did.

His criminal conduct was not aberrational.  It was consistent and multi-faceted over the course of

years.  Again and again, month after month, Bennett made the decision to proceed with criminal

conduct.  However he may have started, it is clear that he developed a "criminal mindset." (Def.

Sent. Mem. at 5).

Notwithstanding his criminal conduct, Bennett contends that a sentence of incarceration is

unnecessary to serve the purposes of general deterrence, specific deterrence, and punishment.

(Def. Sent. Mem. at 28).  As to general deterrence, the Government respectfully submits that the

need for general deterrence weighs in favor of a significant prison sentence in this case.  Insider

trading is a crime that, as demonstrated by the facts of this case, can be incredibly lucrative and is

difficult both to detect and to prosecute.  Indeed, although the Government ultimately was able to

piece together the evidence of this scheme by meticulously reviewing and analyzing, among other

things, MetroCard records (showing Allen and Bennett at the same subway station at the same

time) and flight records (placing Allen at LaGuardia Airport at the time of calls from a phone at

the Delta Sky Lounge to Bennett), this case highlights some of the difficulties of prosecuting this

type of crime.  Because people who find themselves faced with the choices that Bennett made

throughout his criminal scheme recognize that insider trading is (a) potentially very profitable and

(b) hard to detect and prosecute, it is important that the calculus also include an understanding

10

that, if caught, those committing this offense will be prosecuted and sent to prison. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

As for the purposes of punishment and specific deterrence, both require imprisonment here. Bennett's conduct was too deliberate and sustained for a term of probation to constitute sufficient punishment. And the length and breadth of his misdeeds make it impossible to say with any confidence that the exceedingly light penalty represented by a term of probation would be sufficient to deter Bennett from making the same criminal choices in the future that he proved fully capable of making again and again during the course of the various schemes in which he engaged in this case.

Bennett's assertions that the "stigma and collateral effects" of his conviction "present great penalties in and of themselves," or that a prison sentence will forever diminish his ability to make a living, ring particularly hollow in this case. (*See* Def. Sent. Mem. At 28). Bennett is in the film industry. Unlike defendants in regulated or licensed industries – like the securities industry or the legal profession – Bennett will face no explicit bar from his profession as a result of his conviction. And as for some potential "tarnishing [of] his reputation" that would impact his ability to earn a living (Def. Sent. Mem. at 28), it is difficult to conceive of an industry in which a criminal conviction would be of less professional consequence than the film industry.[3] There is

_____

[3] As an admittedly extreme example, famed director Roman Polanski pled guilty in connection with the sexual abuse of a 13-year old in the late 1970s, and then fled before sentencing, but has nonetheless continued to work freely in the industry from abroad even while

11

simply no reason to believe – and Bennett has not offered one – that the stigma of a criminal conviction will prevent Bennett from pursuing work in his chosen profession.

Finally, Bennett presents basic details concerning the sentences of 35 other insider trading defendants and asks the Court to consider those sentences in determining what is appropriate here. (Def. Sent. Mem. at 36-40 and Ex. E).  What is most readily apparent from the supplied chart, however, is that Bennett's Guidelines range – meaning, the severity of Bennett's criminal conduct, as measured by the criteria selected by the United States Sentencing Commission – is greater than that of all but seven of the defendants on the chart, and each of those similarly situated defendants received a significant term of imprisonment.

---

a fugitive and, indeed, bears so little stigma within the industry from his criminal past and continuing flight that his peers in the industry honored him with the Academy Award for Best Director in 2002.  More recently, the interactions with the criminal justice system of numerous actors and actresses – most of whom continue to find work – demonstrate that the film industry is far more tolerant of individuals with criminal records than many other industries.

## **CONCLUSION**

Accordingly, for the reasons set forth above, John Bennett's request for a sentence that does not involve incarceration should be rejected and the Court should sentence him to a significant term of imprisonment.

Dated:  New York, New York
        December 5, 2012

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney
                                    Southern District of New York


                        By:     /s/ Michael A. Levy
                                    Michael A. Levy
                                    Richard C. Tarlowe
                                    Marissa Molé Bostock
                                    Assistant United States Attorneys

13